**POSTED ON WEBSITE**
**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | ) Case No. 20-12269-B-7 |
| | ) |
| **ANTHONY WILLIAM VILLA,** | ) |
| | ) |
| Debtor. | ) |
| | ) |
| ──────────────────────── | ) |
| | ) |
| VOKSHORI LAW GROUP, a | ) |
| Professional Law Corporation, | ) Adv. Proceeding No. 20-1054-B |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANTHONY WILLIAM VILLA, | ) |
| | ) |
| Defendant. | ) |
| ──────────────────────── | ) |
| ANTHONY WILLIAM VILLA, | ) |
| | ) |
| Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| VOKSHORI LAW GROUP, a | ) |
| Professional Law Corporation, | ) |
| | ) |
| Counter-Defendant. | ) |
| ──────────────────────── | ) |

**MEMORANDUM DECISION**

**Before:  René Lastreto II, Bankruptcy Judge**

───────────────────

Luke Jackson, VOKSHORI LAW GROUP, APLC, Los Angeles, CA, for
Vokshori Law Group, Plaintiff.

Timothy C. Springer, LAW OFFICES OF TIMOTHY C. SPRINGER, Fresno, CA, for Anthony William Villa, Defendant.

RENÉ LASTRETO II, Bankruptcy Judge:

**INTRODUCTION**

11 U.S.C. § 523(a)(2)(A) excepts from discharge a debt of an individual "for money, property, [or] services . . . to the extent obtained by—(A) false pretenses, a false representation, or actual fraud."[1] A law firm successfully performed services and achieved a favorable loan modification for a debtor and his spouse, but they were not paid for their services when the bill came due. Finding that there was not a preponderance of evidence on the issues of intent and justifiable reliance, the court here finds in favor of the debtor. The debt owed the firm is dischargeable.

**I.**

**A.**

Anthony Villa ("Anthony") and his spouse, Maria, found themselves in the throes of financial difficulty in late 2017.[2] Though Maria was employed, Anthony was on disability. They were eight months behind on their mortgage payments. Their income was not high enough to maintain their expenses. They wanted to save

---

[1] Future references to Code sections will, unless otherwise indicated, be referred to by section. Future references to the Federal Rules of Civil Procedure will be to "Civ. Rule" and references to the Federal Rules of Bankruptcy Procedure will be referred to as "Rule" unless otherwise indicated.
[2] Throughout this memorandum, Anthony and Maria Villa will be referred to as "Anthony" and "Maria" or "the Villas." The court means no disrespect and makes those references for ease of following the narrative.

their Los Banos, California residence at 1636 Maidencane Way
from foreclosure.[3]

Anthony learned of Vokshori Law Group ("VLG"). They offered
loan modification services. He contacted them in late December
and spoke with employees Patsy Chanthavongsor and Ann Okada. He
eventually was transferred to a third, Phil Alvarez. Anthony and
Maria signed VLG's Legal Services Agreement ("LSA"). In early
conversations, Anthony said he and Maria had filed bankruptcy in
2010. VLG employees discussed bankruptcy with Anthony. He was
asked to send numerous documents, including pay stubs. A few
days later, Anthony emailed documents to VLG. In early January
2017, responsibility for Anthony and Maria's situation was
transferred to VLG employee Nadia Sommereyns. Nadia was Anthony
and Maria's primary contact at VLG after that.

A word about the LSA. The agreement says VLG would
represent the Villas for a loan modification of their first
mortgage with Caliber Home Mortgage. Services to be performed
are listed. VLG's compensation consists of both a flat fee and
success fee component. The flat fee was $2,800. After 4 months,
a monthly maintenance fee of $325 was charged. If VLG
successfully negotiated a modification, it would be entitled to
$350 for a trial modification. Upon a final modification, VLG
would be entitled under the agreement to 3.6 times the monthly
savings plus 10% of any amount of principal or arrears deferred,
forgiven, or waived. Though VLG did perform bankruptcy services,
they were excluded from coverage of the LSA.[4]

---

[3] A few months earlier they qualified for a modification but that was
unsuccessful.

[4] VLG's principal, Stephen Vokshori, a licensed attorney, testified that
his firm does file chapter 7 and 13 bankruptcies.

Some confusion about the documents VLG needed arose in early January. Anthony followed up to be sure all documents were sent in. They were. Among those was Anthony and Maria's monthly household budget; it showed a negative balance at the end of the month. VLG went to work contacting Caliber's servicer, Shellpoint.

But Anthony and Maria received much correspondence about the default under their home loan from third parties. They began to become very concerned. In late January, their mortgage holder, Caliber, recorded a notice of default.

In early and mid-February, there were tense communications between VLG and Anthony. Anthony was not satisfied with the speed of VLG's responsiveness. Anthony expressed a few times that the extent of his unsecured debt (credit cards plus student loan debt) would necessitate a bankruptcy filing. VLG contacted the servicer who confirmed the residence was in foreclosure, but no sale date was set. VLG's Phil Alvarez again spoke with Anthony about bankruptcy options. By mid-March, Anthony told Nadia that he and Maria were going to consult with a bankruptcy attorney since they were dissatisfied with the modification progress.

In late March, Nadia urged Anthony to give the modification route "a try" before "throwing in the towel" and filing bankruptcy.[5] In early April, Anthony and Maria's first mortgage loan owner changed to New Penn Financial. Near the end of April

---

[5] Anthony has filed previous bankruptcy cases. Two in the Northern District of California: a chapter 13, Case No. 00-55016 filed on October 12, 2000, which was dismissed in early 2001, and a chapter 7, Case No. 03-55410 filed August 22, 2002, resulting in a discharge in early 2003. In this District, Anthony filed a chapter 7 on September 10, 2011, Case No. 11-60203, resulting in a discharge December 20, 2011.

and early May, VLG sent documents to New Penn Financial. Anthony provided additional documents once asked.

Shellpoint, who remained the servicer, had received all necessary documents to evaluate the modification request by mid-May. A trial loan modification was then approved. VLG notified Anthony and Maria. The trial modification was for three months and included a principal deferment. Payments were about $460.00 less per month than before. The interest rate was 4.25% and the three-month trial period began on July 1, 2018.[6] Shellpoint wanted the payments during the trial period by auto pay, which Anthony and Maria agreed to do.

The Villas made all three trial payments.

Near the end of September, Anthony and Maria told VLG they were going through a divorce. Maria wanted to sell the residence. VLG suggested they wait until the modification was finalized. Shellpoint sent the permanent modification to the Villas at their residence. Anthony requested time to collect all signatures, as well as a delay for the first payment under the permanent modification.[7] In early October, Anthony told VLG he and Maria were going to or had signed the permanent modification. But he also mentioned he wanted to file Chapter 13. Anthony testified he was living in his car, and he purchased a car since he was using it as a residence at times. Anthony asked how the contract would be affected in a Chapter 13.

---

[6] In early June, Anthony thought their residence was sold. He contacted Nadia at VLG, and Nadia found that it had not been sold and reported that to Anthony.

[7] In fact, Anthony had been told before that if the permanent modification was not yet complete by October 1, to expect to make another payment provided in the trial modification.

The relationship between VLG and the Villas then deteriorated. VLG sent an invoice for their fees totaling $6,346.06 in mid-October.[8] By the end of October, New Penn Financial had incorporated the permanent modification for the loan. Anthony told Nadia in a phone conversation he was having surgery, he needed to go to court on the family law issues and wanted three weeks to make payment arrangements. That was not acceptable to VLG who wanted at least an immediate down payment on the balance. Further contact between Anthony, Maria, and VLG was fruitless.

Months passed and many voice mails and contact attempts by VLG to Anthony went unheeded. On March 1, 2019, five months after the permanent loan modification was approved, Anthony filed a Chapter 13 bankruptcy in the Northern District of California (19-50435). VLG filed an adversary proceeding contesting the discharge of its debt under § 523(a)(2)(A) (fraud). Adv. Proc. No. 19-05030. But the bankruptcy (and the adversary proceeding) was dismissed six months later before plan confirmation. In January 2020, Maria filed her own bankruptcy case in the Northern District of California (20-50017). VLG filed an adversary proceeding (20-05023) in that case but about a year and one-half after the bankruptcy case was filed, it was dismissed for Maria's failure to make plan payments. The adversary proceeding was also dismissed.[9]

---

[8] California law precludes VLG from collecting fees for loan modification services until it has completed its services. Cal. Civ. Code § 2944.7 (Deerings 2022).

[9] The court takes judicial notice of the adjudicative facts about the bankruptcy proceedings under Fed. R. Evid. 201.

On July 4, 2020, Anthony filed this bankruptcy case. VLG
timely filed this adversary proceeding contesting the discharge
of their debt under § 523(a)(2)(A). Anthony, through counsel,
filed a counterclaim for attorneys' fees under § 523(d) if he
was successful in the litigation. Following discovery and
pandemic-related delays, the case was tried on March 31, 2022.
The parties have stipulated that the debt at issue here is a
consumer debt under § 101(8) and that no payment has been made
on the debt.[10]

**B.**

VLG offered one witness: Stephen Vokshori, the attorney
principal of VLG. The court found Mr. Vokshori knowledgeable,
experienced, and very familiar with bankruptcy law and practice.
He was forthright in his answers to cross-examination questions,
but his testimony suffered from one shortcoming: a lack of
personal knowledge of the communications his staff had with
Anthony and Maria. He had to rely on an ongoing real time
contemporaneous log of the interactions between staff, the loan
servicers, and the Villas.[11] To be sure, the notes were admitted
in evidence since they were relevant and were business records.
But Mr. Vokshori had to speculate about the effect of those
interactions highlighted by both counsel during the trial.
Anthony did not really dispute the contents of contemporaneous
notes, but the effect of these entries on the case here is left
to speculation.

---

[10] *Amended Joint Pretrial Order*, Doc. #98, at 5.
[11] VLG's counsel and Mr. Vokshori refer to these contemporaneous notes
as the "ACT database."

1    Anthony was his only witness. The court found him sincere,
2    but he was not specific on many details when cross-examined by
3    VLG's counsel. VLG attacked Anthony's credibility. First, there
4    was a question of whether Anthony was forthright with VLG when
5    he first discussed the extent of his unsecured debt. There was a
6    large discrepancy in the contemporaneous notes. Anthony first
7    stated his unsecured debt was between $10,000.00 and $15,000.00—
8    primarily from credit cards. But his unsecured debt was larger
9    when outstanding student loans were considered. Anthony
10   explained that to him the debts were different. True when one
11   considers the effect of discharge.

12   VLG also contends that Anthony's testimony was uneven and
13   contradictory on certain points. The one specific example
14   pertained to testimony about who his initial contacts were at
15   VLG. Anthony's pre-trial declaration stated his initial contact
16   was with Annie Okada. VLG disputed that, relying upon the
17   contemporaneous log. But the log entry on December 19, 2017
18   contained a description of a phone conference with Anthony that
19   was entered by Ann Okada. Patsy Chanthavongsor may have
20   initially spoke to Anthony and then transferred the call.[12]
21   Anthony did alter his testimony by saying he remembered his
22   first contact was a female. This is a discrepancy, but to the
23   court an insignificant one. Anthony did not remember certain
24   details, but there was little dispute about the accuracy of the
25   log entries.
26   ///
27   ///
28

[12] Px 2, at 116.

**II.**

**A.**

The United States District Court for the Eastern District of California has jurisdiction over this matter under 28 U.S.C. § 1334(b) since this is a civil proceeding arising under Title 11 of the United States Code. The District Court has referred this matter to this court under 28 U.S.C. § 157(a). This is a "core" proceeding under 28 U.S.C. § 157(b)(2)(I). Even if found to be "non-core," the parties have agreed this court may enter orders finally disposing of this proceeding.[13]

**B.**

To exclude a debt from discharge under § 523(a)(2)(A), a creditor must establish that:

  1) The debtor made representations.

  2) That at the time he knew they were false.

  3) That he made them with the intention and purpose of deceiving the creditor.

  4) That the creditor justifiably relied on such representations.

  5) That the creditor sustained the alleged loss and damage as a proximate result of the representations having been made. *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996); *see also Turtle Rock Meadows Homeowners Ass'n. v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000). "[M]ere failure to fulfill [a] promise to pay [a] debt is dischargeable, unless [the] debtor

---

[13] *Amended Joint Pre-trial Order*, Doc. #98, at 6.

made [the] promise while not intending to pay or knowing that payment would be impossible." *Kuan v. Lund (In re Lund)*, 202 B.R. 127, 131 (B.A.P. 9th Cir. 1996), citing *Citibank (S.D.) N.A. v. Lee (In re Lee)*, 186 B.R. 695, 699 (B.A.P. 9th Cir. 1995). "Intent to deceive can be inferred from surrounding circumstances." *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997).

The burden of proof is on VLG here to establish non-dischargeability under § 523(a)(2)(A), including justifiable reliance. *Field v. Mans*, 516 U.S. 59, 66 (1995). "Because a fundamental policy of the Bankruptcy Code is to afford debtors a fresh start, 'exceptions to discharge should be strictly construed against an objecting creditor and in favor of the debtor.'" *Scheer v. State Bar (In re Scheer)*, 819 F.3d 1206, 1209 (9th Cir. 2016), quoting *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992); *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994).

The court has considered the direct testimony submitted by declaration, the live testimony presented at trial, the documentary evidence, and stipulated facts. The court is not convinced that VLG has met its burden of proof as to at least two of the elements of its claim: intentional misrepresentation and justifiable reliance. Since the court is compelled to strictly construe discharge exceptions, the burden of proof is critical.

///

///

///

**1.**

"For purposes of § 523(a)(2) . . . the timing of the fraud and elements to prove fraud focus on the time . . . of the extension of credit to the Debtor . . . Congress' use of 'obtained by' in § 523(a)(2) 'clearly indicates that fraudulent conduct occurred at the inception of the debt, i.e. the debtor committed a fraudulent act to induce the creditor to part with his money or property.'" *New Falls Corp. v. Boyajian (In re Boyajian)*, 367 B.R. 138, 147 (B.A.P. 9th Cir. 2007) (internal citation omitted), quoting *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002), citing *McClellan v. Cantrell*, 217 F. 3d 890, 896 (7th Cir. 2000) (Ripple, Circuit Judge concurring). A § 523(a)(2)(A) claim requires that the "target misrepresentation must have existed at the inception of the debt, and the creditor must prove that he or she relied on that misrepresentation." *Bethke v. Shane*, 548 B.R. 291, 298 (Bankr. N.D. Cal. 2016), quoting *Reingold v. Shaffer (In re Reingold)*, Nos. CC-12-1112-PaDKi, CC-12-1141-PaDKi, 2013 WL 113646 at *5 (B.A.P. 9th Cir. March 19, 2013). "[T}he intention not to perform must be present when the agreement is formed; otherwise only a breach of contract is proven." *Yaikian v. Yaikian (In re Yaikian)*, 508 B.R. 175, 186 (Bankr. S.D. Cal. 2014). Intent to defraud is a factual question. *Kennedy*, 108 F.3d at 1018.

VLG's theory is that Anthony did not intend to pay when he and Maria signed the LSA. VLG relies on Anthony's numerous bankruptcies, which pre-dated their relationship as evidence of Anthony's fraudulent intent. The court is unconvinced.

First, there is a six-year gap between Anthony's last discharge and the beginning of VLG's services. Anthony and Maria purchased the Los Banos residence during the interim period and over a year before contracting with VLG.[14] They were approved for a modification before contacting VLG. This does not suggest an intent to deceive.

Second, it is undisputed that Anthony was on disability and he and Maria's income had been severely impacted. One of the Villas' primary goals were to save their home. The loan modification process would be a way to do that. This does not suggest Anthony was planning to file bankruptcy and risk the loss of the home to avoid paying VLG.

Third, throughout the modification process and document-information gathering phase, Anthony cooperated in obtaining the documents and responding to VLG's requests. This militates against a finding that Anthony intended to deceive VLG from the outset. Anthony could have been slow in responding or unavailable if he was planning to file bankruptcy anyway. The Villas also paid three trial modification payments and one in October of 2018. The Villas took steps to perform under the contract; not avoid the contract.

Fourth, two significant events occurred in the fall of 2018 that changed Anthony's situation. He was having to undergo surgery and he and Maria were going through a divorce. Based on the evidence, Anthony knew neither of these events when VLG began performing services. No evidence was presented that when

---

[14] Px 2, at 39.

the LSA was signed Anthony had no prospective ability to perform the LSA notwithstanding his coexisting financial struggles.

VLG contends that Anthony was a demanding and difficult client, which suggests an intention to not pay VLG. The court disagrees. True enough, there were a few tense moments in the first quarter of 2018 coinciding with the recording of the notice of default and some gaps in communication. But even Mr. Vokshori testified that it appeared that Anthony was then wanting to "crack the whip" and be assured VLG was working toward saving the residence.

It is also true that in the fall of 2018 and for months thereafter, Anthony and Maria were not responding to communications from VLG to collect the outstanding balance. But that was after the marriage was dissolving, Anthony's surgery, and the change in Anthony's living arrangements. Avoiding creditors is not unusual for any debtor who is in financial difficulty.[15]

Finally, Anthony's bankruptcy filing in the Northern District of California in March 2019 was dismissed before plan confirmation. This does not suggest that Anthony intended to avoid paying VLG over one year earlier.

The facts here are inconsistent with the theory that Anthony never intended to pay VLG nor lacked an intent to perform. But even if intent was proven—it was not—the facts are also inconsistent with VLG's justifiable reliance.

---

[15] Anthony's purchase of a car in the fall of 2018 was explained at trial. Anthony was having to occasionally live in his car and financed one to accommodate his occasional need to rely on the vehicle for shelter. But the filing of a chapter 13 immediately thereafter would not result in a bifurcation of the secured claim. *See* § 1325(a) "hanging paragraph." So that does not suggest an initial intent to avoid paying VLG.

**2.**

A creditor's reliance (upon the representation) need only be justifiable, not reasonable. *Field v. Mans*, 516 U.S. at 74; *Citibank (S.D.) N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1090 (9th Cir. 1996). Justification "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.*, at 71 (quoting Restatement (Second) of Torts § 545A cmt. b (1976)). This is a subjective standard in which the court considers the knowledge and relationship of the parties. *Sea Win, Inc. v. Tran (In re Tran)*, 301 B.R. 576, 583 (Bankr. N.D. Cal. 2003) (finding justifiable reliance when vendor checked credit history but limited damages to initial credit limit), citing *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 67 (B.A.P. 9th Cir. 1998).

VLG is a law firm with considerable experience in loan modifications and bankruptcies. Anthony and Maria came to them for their expertise. There is no evidence VLG checked to determine if any bankruptcies had been filed by Anthony, Maria, or both before their relationship. From the beginning, Anthony mentioned that a bankruptcy would eventually be needed because of his substantial unsecured debt. The budget form that Anthony submitted to VLG showed nearly a $500.00 negative balance.[16] Anthony was on disability and not regularly employed.[17] An experienced bankruptcy and loan modification service firm is in a far better position to determine whether to enter into an

---

[16] Dx B-1.
[17] Dx C-1.

agreement with a prospective client than most. The circumstances
of this case establish the lack of justifiable reliance.

VLG points to the terms of the LSA as establishing their
justifiable reliance. True enough, negligence in failing to
discover an intentional misrepresentation is no defense. *In re
Eashai*, 87 F.2d at 1090. But here, there is no intentional
misrepresentation. Anthony told VLG that bankruptcy was
potentially part of the entire process of reorganizing the
Villas' debts.

VLG employees reviewed bankruptcy "options" with Anthony in
December 2017. After receiving correspondence concerning the
Villas' default on their home loan Anthony told Nadia he was
thinking again about bankruptcy.[18] In March 2018, Anthony
expressed dissatisfaction with the modification process and said
he had an appointment with a bankruptcy attorney within one
week.[19] In late March, Nadia urged that Anthony and Maria wait on
filing bankruptcy, and at least give the modification "a try."
All of this occurred before the approval of the loan
modification. VLG had opportunities to stop performing services.
They chose not to do that. VLG had the facts before them and
continued performing under the contract. Laudable that may be,
but it supports the conclusion that VLG did not justifiably rely
on the terms of the LSA in performing the continued services.

///

///

///

---

[18] Px 2, at 90.
[19] Px 2, at 84.

## CONCLUSION

VLG performed their services under the LSA. The result was favorable to the Villas. Unfortunately, Anthony's breach of his contractual duty to pay for the services rendered by VLG does not except the debt owed VLG from discharge in his Chapter 7 proceeding. VLG did not meet the burden of proof on the issues of intentional misrepresentation or justifiable reliance. This is especially true given the court's duty to narrowly construe the discharge exceptions. For the foregoing reasons, VLG shall take nothing by way of its complaint. Should Anthony Villa seek costs and attorneys' fees under § 523(d) or other provision of law, it shall be by fully noticed motion filed and served as provided in Civ. Rule 54, as applicable to bankruptcy proceedings under Rule 7054. VLG may oppose the motion. The court will issue a separate judgment, which may be amended if either costs, attorneys' fees, or both are awarded.[20]

**Dated:** Apr 07, 2022                    **By the Court**

*René Lastreto II*

**René Lastreto II, Judge**
**United States Bankruptcy Court**

---

[20] The above shall be the courts findings of fact and conclusions of law under Civ. Rule 52. Should any conclusion of law be deemed a finding of fact the court adopts it as such and vice versa.

**Instructions to Clerk of Court**
**Service List - Not Part of Order/Judgment**


    The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below.  The Clerk of Court will send the Order via the BNC or, if checked ___, via the U.S. mail.

Anthony William Villa
1839 Loma Linda Circle
Los Banos CA 93635

Nima S. Vokshori
1010 Wilshire Blvd #1404
Los Angeles CA 90017

Luke Jackson
1010 Wilshire Blvd #1404
Los Angeles CA 90017

Timothy C. Springer
4905 N West #102
Fresno CA 93705